UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
GARY LIANG,

                                 Plaintiff,

        -against-


THE CITY OF NEW YORK; RAYMOND KELLY,
Commissioner of the New York City Police
Department; BRIAN J. MAGUIRE, Deputy Inspector
of NYPD 109th Precinct; NEW YORK CITY
POLICE DEPARTMENT; DETECTIVE ROBERT
ZEE, individually and in his official capacity as a
detective in the New York City Police Department;
DETECTIVE ALBERT HAWKINS, individually and
in his official capacity as a detective in the New York
City Police Department; DETECTIVE SHIM,
individually and in his official capacity as a detective
in the New York City Police Department;
DETECTIVE CHRISTOPHER VAUGHN,
individually and in his official capacity as a detective
in the New York City Police Department;
DETECTIVE SCALI, individually and in his official
capacity as a detective in the New York City Police
Department; LIEUTENANT CONFORTI,
individually and in his official capacity as a lieutenant
in the New York City Police Department;
SERGEANT MICHETTI, individually and in his
official capacity as a sergeant in the New York City
Police Department; SERGEANT NATOLI,
individually and in his official capacity as a sergeant
in the New York City Police Department; "JOHN
DOE," individually and in his official capacity as a
New York City police officer, "JOHN DOE" being a
fictitious name, the true name not known at this time;
"JANE DOE," individually and in her official
capacity as a New York City police offer, "JANE
DOE" being a fictitious name, the true name not
known at this time; XIN XU; BEI WANG; DA PENG
SONG; IVAN QUEK, aka IVAN SUN; and YI JING
TAN, aka "KERRY,"

                             Defendants.
------------------------------------------------------------------ x

**MEMORANDUM AND
ORDER**

10-CV-3089 (ENV) (VVP)

1

VITALIANO, D.J.

Plaintiff Gary Liang brings this civil rights action against defendants the City of New York ("the City"), the New York Police Department ("NYPD"), Police Commissioner Raymond Kelly, Deputy Inspector Brian Maguire, Captain[1] Thomas Conforti, Sergeant Michetti,[2] Sergeant Brian Natoli, Detectives Robert Zee, Albert Hawkins, Jae Shim, Christopher Vaughn, and Edward Scali, and Police Officers "John Doe" and "Jane Doe" (collectively "the City defendants"), as well as against Xin Xu, Bei Wang, Da Peng Song, Ivan Quek (aka Ivan Sun) and Yi Jing Tan (aka Kerry Tan), individuals unaffiliated with the City (collectively "the non-City defendants"). Liang alleges violations of his constitutional rights relating to three occasions on which he was arrested. In his amended complaint, plaintiff sues the City and NYPD as institutional entities, defendants Kelly and Maguire in their official capacities, defendants Zee, Hawkins, Shim, Vaughn, Scali, Conforti, Michetti, Natoli, "John Doe," and "Jane Doe" in both their official and personal capacities, and all non-City defendants personally. (Am. Compl. (Dkt. No. 2) ¶¶ 8-26). The City defendants now move under Rule 12(b)(6) to dismiss all counts against

---

[1] Captain Conforti is listed in the complaint as a lieutenant, but, according to the City defendants, his current rank is that of captain.

[2] Plaintiff did not provide a first name for Sergeant Michetti. Defendants state that they have been unable to identify any such individual and have received no request for legal representation by anyone of that name. (City Defs.' Mem. (Dkt. No. 55) at 1 n.1). However, as a purported officer in the NYPD, the Court considers him among the City defendants and considers their arguments on his behalf.

them except for plaintiff's claim for unreasonable search and seizure.[3] For the
reasons discussed below, the motion is granted.

## Factual Background

Liang claims that this § 1983 action springs from the fact, he believes, that he
is or was the target of a large conspiracy involving all defendants to deprive him of
his civil rights. He alleges that the City defendants falsely arrested him on three
occasions in response to the non-City defendants' bribes or improper gratuities and
false complaints. (Am. Compl. ¶¶ 145-149).[4] He alleges further that, in the case of
each arrest, NYPD officers unlawfully seized or searched his belongings, (*id.* ¶¶ 143-
44), failed to read him his Miranda rights, (*id.* ¶ 90), declined to take a statement
from him, (*id.* ¶ 91), prohibited him from contacting counsel for approximately 12
hours, (*id.* ¶ 92), and detained him for approximately 24 hours. (*Id.* ¶ 93). The
charges stemming from all three arrests were dismissed on speedy trial grounds,
pursuant to New York Criminal Procedure Law § 30.30. (*Id.* ¶¶ 53, 80, 89, 147(h)).
At the center of the litigation vortex is defendant Tan, with whom Liang had been

---

[3] Although they have not moved to dismiss this count, the City defendants have
hardly conceded it. They have reserved what is certainly the right to move for
summary judgment later. (City Defs.' Mem. at 1 n.2).

[4] According to plaintiff, the City defendants received "benefits" from the civilian
defendants that included a demo line for unlimited cell phone calls and cell phone
accounts; in exchange, City defendants "took the cell phone business from [p]laintiff
and gave it to [defendant] Tan." (Pl.'s Mem. (Dkt. No. 56) at 11).

3

romantically involved from 1999 through 2007[5] and with whom he co-owned several businesses. (*Id.* ¶¶ 27-28.)

## I.   The July 9 Arrest

On or about July 5, 2007, Tan filed a complaint with NYPD's 109th Precinct in Queens. (Decl. of Elizabeth Norris Krasnow in Support of City Defs.' Mot. to Dismiss ("Krasnow Decl.") (Dkt. No. 54), Exh. B). During her interview with Detective Zee, Tan claimed Liang assaulted her and stole $5000 from her pocketbook before departing for Shanghai. (*Id.*). She showed Detective Zee bruises on her arms and legs that she attributed to Liang, and informed the detective that Liang would be returning from Shanghai on the night of July 8, 2007. (*Id;* Krasnow Decl., Exh. E). On that date, Detectives Zee and Shim met plaintiff at the airport and Detective Zee arrested him (without a warrant, according to Liang) for burglary, robbery, and assault. (Krasnow Decl., Exhs. D, E; Am. Compl. ¶¶ 36-44).[6] According to Liang, Zee claimed that the laptop Liang was carrying belonged to Tan, and seized both the laptop and Liang's passport. (Am. Compl. ¶ 45). Additionally, Tan was at the 109th Precinct when Liang was brought in; she was permitted to search his belongings and to take several items, including Liang's

---

[5] Tan asserts in her answer that the relationship began in 2002 (Def. Tan's Ans. (Dkt. No. 38) ¶ 5), but on a motion to dismiss, the Court must accept as true all factual allegations in the complaint and decide factual disputes in favor of the non-moving party. *See Midouin v. Downey Savings and Loan Ass'n, F.A.*, 834 F. Supp. 2d 95, 102 (E.D.N.Y. 2011).

[6] The arrest was actually made shortly after midnight on July 9. (Exh. D).

apartment keys and ATM card. (*Id.* ¶¶ 49-50). Liang alleges that he received no property voucher for any of the items that were taken from him, and that none of the seizures were documented. (*Id.* ¶ 46).

## II.   The February 28 Arrest

On January 30, 2008, Tan obtained an order of protection against plaintiff ("the January 30 order of protection"). (*Id.* ¶ 54; Krasnow Decl., Exh. F). The order forbade Liang from communicating with Tan or going to her residence/place of business, but permitted "incidental contact at work and apartment," (Exh. F), presumably because Liang and Tan co-owned properties and businesses. The addresses where Liang and Tan had joint interest are not explicitly listed on the order of protection. On February 28, 2008, Liang went with three friends to 41-40 Kissena Boulevard. (Am. Compl. ¶ 57). Although the amended complaint is not entirely clear on this point, it seems to indicate that 41-40 Kissena Boulevard housed EW Studio, a business Liang and Tan jointly owned. (*Id.* ¶¶ 29, 64). Liang claims he had learned that Tan "had started her own company and had attempted to have the landlord assign the lease to this new company." (*Id.* ¶ 57). The purpose of Liang's visit, he claims, was to defend his property.[7] Upon encountering several people at the premises he determined were Tan's employees, and who are now also non-City

---

[7] Liang does not identify the landlord of 40-41 Kissena Boulevard.

defendants,[8] Liang called the police to report the intruders' presence in his store. (*Id.* ¶ 59).

Two uniformed officers arrived in response to Liang's call. (*Id.* ¶ 60). Shortly thereafter, Detectives Zee, Shim, and Hawkins arrived at the scene in plain clothes, but in response to a complaint by Tan, which they received by radio dispatch. (Krasnow Decl., Exh. H). The three detectives instructed the uniformed officers to "step aside," explaining that Liang was not permitted to be on the premises. (*Id.* ¶¶ 61-63). Liang pointed out indicia of his business ownership—namely, two licenses on the wall bearing the name of one of Liang's companies, certificates of incorporation, and stock certificates. (*Id.* ¶¶ 65-66). However, Detective Shim discounted those business authorizations in favor of a customer's invoice that displayed the new company's name, "Sagar Wireless." (*Id.* ¶¶ 63, 67).

Next, Liang claims, Detective Zee searched his belongings without his permission, then instructed the uniformed officers to arrest him and one of his friends. (*Id.* ¶¶ 69-70). Following his arrest, Liang was charged, in a complaint authored by Detective Hawkins, with criminal contempt (violation of an order of protection) and trespassing. (*Id.* ¶ 71; Exh. G). The next day, February 29, Tan obtained a second order of protection prohibiting Liang from going to her residence

---

[8] It is unclear precisely which non-City defendants were at the store when Liang arrived. The criminal complaint filed against Liang mentions Wang (Krasnow Decl., Exh. G); Tan mentions Wang and Song in her statement (Krasnow Decl., Exh. K); and the Amended Complaint mentions Quek. (Am. Compl. ¶ 58). That someone was there is not disputed; the identities of the entire cast *are* disputed, but the issue is immaterial to this motion.

or place of business and from contacting her ("the February 29 order of protection"). (Krasnow Decl., Exh. L).

### III.   The June 18 Arrest

On March 24, 2008, in response to a complaint filed by Tan, Detective Vaughn issued a criminal complaint against Liang charging him with violating the February 29 order of protection by contacting Tan two days earlier and threatening to kill her. (Krasnow Decl., Exhs. M, S; Am. Compl. ¶ 81). On or around 8 p.m. on May 30, Detective Vaughn and four other detectives went to plaintiff's apartment. (Am. Compl. ¶¶ 82-83). After learning Liang was out, Detective Vaughn left his card with plaintiff's doorman. (*Id.*) On June 18, 2008, Liang voluntarily surrendered at the 109th Precincts station house and was arrested by Detective Vaughn. (*Id.* ¶ 84; Krasnow Decl., Exh. T). Liang claims he had an alibi for March 22, 2008, the date of the alleged violation, but that Detective Vaughn refused to take his statement. (Am. Compl. ¶¶ 87-88).

### IV.   Liang's Post-Arrest Allegations

Liang relies on a number of happenings that occurred after one or more of the arrests. First, he claims that, on July 9, 2007, Detective Zee, and/or someone affiliated with Detective Zee and at his behest, went to the office of Allen Chiu, Liang's attorney, and threatened him not to close on a real estate transaction that Liang and Tan had negotiated earlier to transfer a condo from Tan to Liang's mother. (*Id.* ¶¶ 31, 52). Second, he alleges that, on or about July 13, 2007, Detective Zee "activated a demo line phone, which allows the user to make free calls to any

7

number and is supposed to be reserved to either mobile phone carrier employees or affiliates." (*Id.* ¶ 55). Third, he alleges that, "on or about November 10, 2007, Defendant Hawkins activated a wireless account with EW Studio Inc., one of Plaintiff's businesses." (*Id.* ¶ 56).

Liang next claims that, on or about September 23, 2008, an otherwise unidentified "Judge Grace" issued an order enjoining Tan, Tan's employees, and her "agents" from conducting business at 41-40 Kissena Boulevard and enjoining Tan from interfering with EW Studio's business operations. (*Id.* ¶ 98). On or about October 28, 2008, Liang further asserts, Steve Wong, to whom he had granted power of attorney, attempted to execute the "order" issued by "Judge Grace." That effort was stymied, however, when Tan's employees refused to leave the store premises. When Wong and an otherwise unidentified "retired police officer Phil" went to 41-40 Kissena Boulevard accompanied by two officers, one of Tan's employees, he alleges, contacted Detective Zee, who then spoke with the officers who had accompanied Wong to the premises. (*Id.* ¶¶ 99-105).

Following this episode, plaintiff claims that, in October and November of 2008, Defendant Scali convinced two individuals—Xiao Yun Li and "retired police officer Phil"— to falsely accuse him of plotting to murder Detective Zee. (*Id.* ¶¶ 106-07). Liang also alleges that Detectives Conforti and Michetti took from him the key to the store at 41-40 Kissena Boulevard on December 2, 2008 and gave it to Tan. (*Id.* ¶¶ 109-112). Finally, Liang asserts that, on May 27, 2010, he received a letter from

8

the NYPD Investigations Unit in response to two complaints[9] he had filed against Detective Zee, stating there was sufficient evidence to prove misconduct against the detective. (*Id.* ¶¶ 96-97, 119-120).

## V.    Liang's Causes of Action

Liang's 13-count complaint asserts federal causes of action based on denial of equal protection of the law in violation of the Fourteenth Amendment (Count 1), unreasonable search and seizure of property in violation of the Fourth Amendment (Count 2), false arrest in violation of the Fourth Amendment (Count 3), civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 5), conspiracy to violate his civil rights under 42 U.S.C. §1985[10] (Count 10), and violations of his civil rights under 42 U.S.C. § 1983 (Counts 11-13).[11] Liang also asserts supplemental state law claims for unlawful detention and confinement (Count 4), filing of false criminal complaints (Count 6), violations of parallel rights under the New York state constitution (Count 7), tortious interference with a contract (Count 8), violation of the state's police power (Count 9), and negligent

---

[9] Liang submitted the first of these complaints on July 11, 2008, and the second on or about September 18, 2008, after allegedly seeing Detective Zee walking out of the store at 41-40 Kissena Boulevard. (Am. Compl. ¶¶ 96-97).

[10] Although plaintiff does not specifically cite 42 U.S.C. § 1985 in this count, it is clear from the context of the complaint that he intends to assert this cause of action.

[11] Counts 1, 2 and 3 are folded into Liang's § 1983 claim, which is the statutory vehicle by which an individual may assert a private cause of action against state officials for federal constitutional injuries.

supervision (Count 10). As relief, plaintiff seeks, among other things, compensatory damages and injunctions against both the City and non-City defendants.

**Standard of Review**

I.   **Stating a Claim**

When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662 (2009)). To survive the motion, the complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To the extent there are disagreements or ambiguities of fact, the Court must construe all the facts in a light most favorable to the plaintiff and draw all reasonable inferences in his favor. *See Matson v. Board of Educ. of City School Dist. of New York*, 631 F.3d 57, 72 (2d Cir. 2011).

However, the court need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Moreover, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal citations and quotations omitted). On the other hand, "a complaint need not pin

10

plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011). All that is required is "a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Id.*

## II. Consideration of Materials Outside the Pleadings

"[O]n a motion to dismiss, a court may only consider [1] the pleading itself, [2] documents that are referenced in the complaint, [3] documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and [4] matters of which judicial notice may be taken." *Arrocha v. City Univ. of New York*, 878 F. Supp. 2d. 364, 368 (E.D.N.Y. 2012) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) and *Int'l Audiotext Network, Inc. v. Am. Tel.& Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Throughout their briefing, the City defendants refer to various extrinsic documents they have submitted to the Court as exhibits to the Krasnow Declaration. These exhibits are as follows: Liang's amended complaint (Exh. A); arrest or complaint reports (Exhs. D, H, J, M); resulting criminal complaints and their supporting affidavits (Exhs. E, G, K, U); complaint follow-up reports (or DD5s) (Exhs. B-C, N-T); the two orders of protection issued against plaintiff (Exhs. F, L); and an invoice from the 41-40 Kissena Boulevard store (Exh. I).

There is no dispute that Liang's amended complaint is properly considered on a motion to dismiss. However, Liang contends that none of the City defendants' other exhibits fall within any of the four fair game categories described in *Arrocha*. (*See* Pl.'s Mem. at 3). The City defendants press their consideration, claiming that

11

all exhibits have been implicitly incorporated by reference into the complaint and/or are proper for judicial notice. (*See* City Defs.' Reply (Dkt. No. 58) at 1-3). All but the invoice (Exh. I), the Court finds, are properly considered on this motion.

To start, throughout his complaint, Liang explicitly references and relies upon a number of the exhibits he now seeks to exclude from the Court's consideration. These documents include the first criminal complaint preferred against Liang, (*see* Am. Compl. ¶¶ 33, 146(a)), the first order of protection, (*see id.* ¶¶ 54, 75, 86, 88), the second criminal complaint, (*see id.* ¶¶ 73, 147(a)), supporting affidavits made by Tan, Song, and Wang on March 12, 2008, (*see id.* ¶¶ 73-74, 76-77), and the second order of protection. (*See id.* ¶ 79). Exhibits E, F, G, K, and L, therefore, are clearly incorporated by reference into the complaint, and the Court may consider them as though they were part of the complaint itself.

With the exception of Exhibit I (the invoice), the remaining exhibits are all either complaint reports (Exhs. H, M), follow-up reports to the complaint (DD5s) (Exhs. B-C, N-T), arrest reports (Exhs. D, J), or documents filed in a court of record (Exhs. U, V).[12] The Court may take judicial notice of these materials, as they are in the public record. *See Wims v. New York City Police Dep't.*, No. 10-Civ-6128,2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011) (a district court may take judicial notice of "arrest reports, criminal complaints, indictments and criminal disposition data"

---

[12] Although Liang explicitly references a complaint filed against him regarding the third incident for which he was arrested, he dates this complaint March 22, 2008. (Am. Compl. ¶¶ 81, 148(a)). Exhibit V is dated July 18, 2008, and is therefore not incorporated by reference into the complaint.

when deciding a 12(b)(6) motion); *Obilo v. City Univ. of City of New York*, No. 01-CV–5118, 2003 WL 1809471, at *5 (E.D.N.Y. Apr. 07, 2003) ("[J]udicial notice can be taken of the incident report, police complaint and two DD5s completed by [defendant police officer]."); *Wingate v. Deas*, No. 11–CV–1000, 2012 WL 1134893, at *1 n.1 (E.D.N.Y. Apr. 02, 2012) (taking judicial notice of arrest reports); *Canessa v. Cnty. of Suffolk*, No. 09–CV–3256, 2010 WL 1438822, at *1–2 (E.D.N.Y. Apr. 10, 2010) (taking judicial notice of arrest records). Consequently, the Court may consider these records as well, but only to establish "their existence and legal effect," or to "determine what statements [they] contained . . . not for the truth of the matters asserted." *Twine v. Four Unknown New York Police Officers*, No. 10-cv-6622 , 2012 WL 6184014, at *7 (S.D.N.Y., Dec. 12, 2012); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks and emphases omitted).

<u>Discussion</u>

I.    **Claims Against NYPD**

Among the flock of defendants sued by Liang is NYPD. But, as an organizational entity, NYPD is not a proper defendant, since agencies of New York City do not have a separate legal identity from the City. *See, e.g., Nnebe v. Daus*, 644 F.3d 147, 158 n.6 (2d Cir. 2011) ("It is well settled in this Court that, as a general matter, agencies of New York City are not suable entities in § 1983 actions."); *Graham v. City of New York*, 869 F. Supp. 2d 337, 348 (E.D.N.Y. 2012) ("'All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except

13

where otherwise provided by law.'") (quoting N.Y. City. Charter, Ch. 17 § 396); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("The district court correctly noted that the NYPD is a non-suable agency of the City."). Accordingly, all claims against the NYPD are dismissed with prejudice.

II.    Claims Against All Other City Defendants

a.    *The Legal Framework for § 1983 Claims*

"Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere. In order to prevail on a section 1983 claim, the plaintiff must show that the defendant's conduct deprived him of a federal right." *Id.* (internal citations omitted). Although individual state officials, such as police officers, may be liable under § 1983 in their individual capacities, they may assert an affirmative defense of qualified immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (internal quotations omitted). "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotations and

14

alterations omitted). An officer's actions are "objectively reasonable" if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Id.* (internal quotations omitted).

### b. *False Arrest Claims*

Claims for false arrest under § 1983 are based on the Fourth Amendment's protection against unreasonable seizures, which includes the right to remain free from arrest absent probable cause. *See, e.g., Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). It is well established in the Second Circuit that "[p]robable cause is a complete defense to an action for false arrest brought under New York Law or § 1983." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotations omitted); *accord Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118-19 (2d Cir. 1995); *Jaegly*, 439 F.3d at 151. Courts will dismiss a claim for false arrest if the complaint is devoid of facts showing that the arresting officer could not have reasonably concluded that there was probable cause to make the arrest. *See, e.g., Kennie v. White Plains Police Dep't Vice Control Unit*, 108 F.3d 1369, at *2 (2d Cir. 1997); *Kafafian v. Young*, 477 Fed.Appx. 762, at *1 (2d Cir. 2012); *Pugach v. Ventrella*, 152 F.3d 920, at *1 (2d Cir. 1998).

In general, an officer has probable cause to make an arrest if he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Probable cause exists as a matter of law when there is no

15

dispute as to the relevant facts and officers' knowledge at the time of arrest. *See also Fabrikant v. French*, 691 F.3d 193, 217 (2nd Cir. 2012) ("Probable cause encompasses only that information available to the arresting officer prior to and including the point of seizure.") (internal quotations omitted). When information is received from a putative victim or eyewitness, probable cause exists "unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

As the record makes clear, the City defendants had, at the very least, a reasonable basis to find probable cause when arresting Liang on each of the three occasions described in the complaint. Each arrest either followed a complaint made by civilians Tan, Wang, and/or Song to officers at the 109th Precinct. That these complainants would later be named as defendants in this action is irrelevant to the analysis of the false arrest claims lodged against the City defendants. Each citizen complaint to the police involved allegations that Liang had committed (or was in the process of committing) a crime, or had violated (or was in the process of violating) an order of protection, or both. The record on this motion supports those facts convincingly, and, other than his naked assertion of conspiracy, Liang offers not a single plausibly pleaded fact to the contrary. Surely, Liang protested his innocence to the arresting officers, but points to nothing to show why it was unreasonable for them to believe the contrary claims that established probable cause to arrest him. His false arrest claims therefore fall short. *See, e.g., Coyle v. Coyle*, 354 F. Supp. 2d 207, 211-12 (E.D.N.Y. 2005) (dismissing false arrest claims on a 12(b)(6) motion

16

because officers had no reason to doubt victim's statement that plaintiff violated a restraining order).

Specifically, regarding the July 9, 2007 arrest, Tan filed a criminal complaint with the 109th Precinct three days before the arrest, alleging that Liang physically assaulted her, took $5000 from her pocketbook, and used the money to purchase a round-trip ticket to Shanghai. (Am. Compl. ¶ 33; Exh. B). The complainant even advised that plaintiff had a return ticket for July 8. (*Id.*). As reflected in Exhibit E to the Krasnow Declarations—the criminal complaint issued against Liang in New York Criminal Court, Queens County—Detective Zee personally interviewed Tan on July 5. (Exh. E). Consistent with her allegations, he observed bruises on her arms and legs. (*Id.*).

With a powerful effect on this claim, opposite the one he intended, Liang acknowledges Tan made these statements to Detective Zee, but claims that her statements were "false," and asserts that Detective Zee did not conduct an investigation to verify her claims before making the arrest. (Am. Compl. ¶ 34). Simply, "[t]he actual accuracy or veracity of [a witness's] statement is irrelevant to a determination of whether [an officer] had arguable probable cause. Rather, the question is whether [the officer] could have reasonably relied on it." *Escalera v. Lunn*, 361 F.3d 737, 745 (2d Cir. 2004). Although Tan's complaint alone would have been sufficient for probable cause, even without further verification, Detective Zee visually confirmed that she had injuries consistent with her allegations of assault. (Exh. E). There can be no contest that Detective Zee had, at a minimum, an

17

objectively reasonable basis to find probable cause. Indeed, he had probable cause. *See, e.g., Obilo*, 2003 WL 1809471, at *7 (victim's identification of plaintiff as her assailant, as well as visible bruises on her arms, supplied arresting officer with probable cause).[13]

If anything, the circumstances surrounding the February 28 arrest, including breach of the stay away order, demonstrate an even more compelling showing of probable cause. Detectives Zee, Hawkins, and Shim arrived at the Kissena Boulevard address in response to a complaint from Tan alleging that Liang had entered the store, in violation of the January 30 order of protection, and was threatening and harassing her employees, Song and Wang. (Exhs. G-H, K). In line with ordinary police procedures, the arresting officers, the record shows, were dispatched to the store via NYPD's control radio communications. Courts in this circuit have repeatedly found that, in the absence of reason to doubt the complainant, an allegation that an individual has violated a stay away order supports probable cause for arrest. *See, e.g., Jaegly*, 439 F.3d at 151; *Carthew v. Cnty. of Suffolk*, 709 F. Supp. 2d 188, 197 (E.D.N.Y. 2010) (dismissing false arrest claims because officer had probable cause based on report that plaintiff violated order of protection); *Dudley v. Torres*, No. 05-CV-1729, 2008 WL 2149603, at *4-5

---

[13] Liang also asserts a false arrest claim against Detective Shim in connection with the July 9 arrest. However, in the complaint, Liang merely alleges that he saw Detective Shim at the airport when he was being escorted a customs agent. (Am. Compl. ¶ 37). This allegation cannot support a claim against Detective Shim for false arrest, and the count is dismissed as to that defendant as well.

(E.D.N.Y. May 21, 2008) (finding probable cause for an arrest based on plaintiff's alleged violation of a stay away order, despite plaintiff's statement that he "didn't do anything"); *Welch v. City of New York*, 95–Civ–8953, 1997 WL 436382, at *5 (S.D.N.Y. Aug. 4, 1997) (finding probable cause to arrest plaintiff for violation of an expired order of protection because officer had a reasonable basis to believe it was still in effect), *aff'd*, 166 F.3d 1203 (2d Cir. 1998) (summary order).

Once again, Liang pleads no facts supporting even an inference that any of the City defendants had reason to doubt the information provided by Wang, Song, or Tan. Indeed, he readily admits to the existence of the January 30 order of protection, which explicitly directed him to avoid Tan's "place of employment." (Exh. F). Although the Kissena Boulevard address was not explicitly mentioned in the order, it was certainly reasonable for the officers to conclude that the store at that address constituted Tan's "place of employment," since she told the officers that it was "[her] business." (Exh. H). Nothing in any pleading or paper filed by plaintiff suggests Tan's business was not located at that address. Moreover, as the Complaint Report specifies, Tan alleged that Liang "did steal and hold in his possession a cell phone contract which he removed from the office without authority," (*id.*), another allegation Liang does not deny anywhere in his pleadings. As a result, without a reason to disbelieve the complainants, the officers had an objectively reasonable basis to conclude that there was probable cause to arrest Liang on the evening of February 28, 2008.

Liang sees a firewall barring dismissal. He correctly observes that the January 30 stay away order still permitted "incidental contact . . . at work and apartment." (*Id.*; Am. Comp. ¶¶ 54, 75). This limited option avails him nothing. But, the contact on February 28 was far from "incidental." Liang states that he went with three friends to the store that evening because "he heard that Defendant Tan had started her own company and had attempted to have the landlord assign the lease to a new company." (Am. Compl. ¶ 57). By his own account, Liang went to the store to provoke a confrontation, and to resort to self-help to recover what he thought was rightfully his. Indeed, Liang stayed at the store for approximately two hours, where, arrest records show, he threatened to beat up Song if he saw him in the store again. (Exh. K). At a minimum, any officer aware of the January 30 order would have had a reasonable basis to conclude that Liang had violated the order. Admissions by plaintiff in his pleadings show that probable cause abounded.

Nor did that probable cause evaporate because, as Liang claims, the arresting officers ignored his protestations and the visible indications that he owned and operated the business at 40-41 Kissena Boulevard—namely, two Department of Consumer Affairs licenses on the wall, certificates of incorporation, and stock certificates. (Am. Compl. ¶¶ 64-66). All of it, of course, is beside the point. None of it, even if authentic, provided an exception to the January 30 order of protection. At that location, only "incidental" contact was excepted. And, obviously, business ownership and its indicia would not excuse the threatening and harassing conduct

20

about which Tan and her employees complained to the police—crimes chargeable independent of any criminal contempt charge for violating an order of protection.

But, clearly, notwithstanding any other objectively reasonable grounds to conclude that probable cause to arrest Liang existed, the officers arrived at the store to find a confrontational scene, as the pleadings describe, with an order of protection barring the arrestee's presence there (except incidentally). This is enough to establish probable cause, and no further investigation was required to justify the arrest. *See, e.g., Carthew*, 709 F. Supp. 2d. at 197-99 (officers had probable cause based on victims statements, despite "plaintiff's claim that the building was his place of business and that [the victim] did not work there"); *Dudley*, 2008 WL 2149603 at *5; *Welch*, 1997 WL 436382 at *5. Indeed, "officers need not conduct an investigation which exculpates an arrestee. . . . To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" *Dukes v. City of New York*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) (internal citations and quotations omitted); *see also Curley*, 268 F.3d at 70 ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.") (internal quotations omitted).[14]

---

[14] In any event, it is of no moment whether Liang owned and operated a business out of 40-41 Kissena Boulevard, since stay away orders often forbid an individual from entering a place he previously shared with the victim. *See, e.g., Joan FF. v. Ivon GG.*, 85 A.D.3d 1219, 1219-20, 924 N.Y.S.2d 611, 611 (3d Dep't 2011) (upholding issuance of order of protection barring plaintiff from entering apartment he had shared with victim); *People v. Qike*, 182 Misc.2d 737, 740, 700 N.Y.S.2d 640, 643

Liang's third arrest, which occurred on June 18, 2008, followed a similar pattern. On February 29, 2008, Tan obtained a second order of protection against Liang, the terms of which mirrored, or were stronger than, the January 30 order. (Exh. L). On March 24, Tan filed a complaint with the 109th Precinct, alleging that Liang had violated the second order two days earlier by harassing her by telephone. (Exh. M). The harassing call demanded payment of $200,000. (*Id.*). Tans' complaint also accused Liang of approaching her in the garage of the building in which they both lived while brandishing a knife at her. (Exh. M). On June 18, after learning that Detective Vaughn and other officers had been looking for him during the previous days, Liang voluntarily surrendered at the police station. (Am. Compl. ¶¶ 82-84). There, he was arrested for violating the February 29 order of protection and was charged by a criminal complaint authored by Detective Vaughn. (Exh. U).

Once again, Liang fails to plead a plausible false arrest claim. Given the antecedents of the arrest in the record, Liang is required, and fails, to offer reasons why the arresting officers should have doubted Tan's veracity. Instead, he accuses Detective Vaughn of refusing to credit his alibi for March 22, 2008. (Am. Compl. ¶¶ 87-88). As discussed above, the case law makes clear that the officers were not obliged to accept Liang's explanation of events over Tan's, and were permitted to

---

(Sup. Ct., Kings County, 1999) (defendant required to vacate apartment he shared with victim after an order of protection was issued against him); *People v. Scott*, 195 Misc.2d 647, 649, 760 N.Y.S.2d 828, 830 (Sup. Ct., Kings County, 2003) (noting that a home owner can be convicted of burglary for unlawfully entering his own home in defiance of an order of protection).

arrest him based on Tan's allegations. Stated differently, the officers had an objectively reasonable basis to believe that they had probable cause to arrest Liang for violating the February 29 order of protection.

For these reasons, the Court finds that the officers had probable cause, or a reasonable basis to find probable cause, on all three occasions Liang complains of. Consequently, his § 1983 claims and state law claims sounding in false arrest are dismissed with prejudice against the City defendants.

### c. *Equal Protection Claims*

In Count 1, Liang alleges that he was denied equal protection in violation of the Fourteenth Amendment because the City defendants selectively enforced state criminal laws against him. (Am. Compl. ¶¶ 130-141). Specifically, he claims that he was selectively mistreated as compared to Tan on account of his gender. However, he fails to plead facts supporting his otherwise speculative assertions. Any claim of improper targeting for prosecution requires pleading of facts to support it. His equal protection claim fails because he offers no such facts in his pleading. *See, e.g.*, *Kamholtz v. Yates County*, 350 Fed. Appx. 589, 590 (2d Cir. 2009) (selective enforcement claim lacking sufficient factual support in the complaint was properly dismissed on a Rule 12(b)(6) motion); *33 Seminary LLC v. City of Binghamton*, 869 F. Supp. 2d. 282, 309-10 (N.D.N.Y. 2012) (same).

Broadly, to succeed on a selective enforcement claim, a plaintiff must prove that "(1) compared with others similarly situated, [he] was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as

23

race, religion, intent to inhibit or punish the exercise of constitutional rights, or

malicious or bad faith intent to injure a person." *See Brown v. Syracuse*, 673 F.3d

141, 151-52 (2d Cir. 2012) (internal quotations omitted). There can be little doubt

that an arrestee's gender is an "impermissible consideration" for the purposes of a

selective enforcement claim. *See, e.g., Annis v. County of Westchester*, 136 F. 3d 239,

247-48 (2d Cir. 1998) (upholding jury's finding that county had selectively enforced

workplace rules against plaintiff on account of her gender).

However, Second Circuit courts appear split on how to define "similarly

situated." *See Viteritti v. Inc. Vill. of Bayville*, No. 10-CV-3283, 2013 WL 145811, *8

(E.D.N.Y. Jan. 14, 2013) (describing competing definitions of "similarly situated").

Under the stricter definition, the aggrieved party must show that "(i) no rational

person could regard the circumstances of the plaintiff to differ from those of a

comparator to a degree that would justify the differential treatment on the basis of a

legitimate government policy; and (ii) the similarity in circumstances and difference

in treatment are sufficient to exclude the possibility that the [treatment selectors]

acted on the basis of a mistake." *Id.* (quoting *Ruston v. Town Bd. for the Town of*

*Skaneateles*, 610 F.3d 55, 58 (2d Cir.2010)). Under the looser standard, the aggrieved

party need only show that the comparator was or is "similarly situated in all

material respects." *Viteritti ,* 2013 WL 145811 at *8 (quoting *Vassallo v. Lando*, 591

F. Supp. 2d. 172, 184 (E.D.N.Y. 2008)).

Even under the looser standard, Liang still cannot satisfy the threshold

showing described in *Brown*. He conclusorily states that he received disparate

24

treatment as compared to Tan, (*see* Am. Compl. ¶¶ 135-38), but, from his recitation of the actual facts, it is readily apparent that the two were not "similarly situated in all material respects." As discussed in section II.b, *supra*, the City defendants arrested Liang on all three occasions after specific allegations of criminal behavior—physical abuse, verbal harassment, theft of property, violations of the orders of protection, making threatening statements, and brandishing a weapon—had been leveled against him by the putative victims. By contrast, Liang does not allege that he or anyone else ever made complaints about criminal behavior against Tan at or around the time of his arrests, let alone the kinds of allegations that would cause her to be "similarly situated in all material respects." On this ground alone, his selective enforcement claim is subject to dismissal. *See, e.g., Christian v. Town of Riga*, 649 F. Supp. 2d. 84, 94 (W.D.N.Y. 2009) (dismissing selective enforcement claim because plaintiff failed to plead facts showing disparate treatment to similarly situated individuals).

Assuming, *arguendo*, that Liang could satisfy *Brown's* first prong, his claim would still fail on the second. Front and center are Liang's charge that law enforcement selectively targeted him based on his gender, and/or their malicious intent to deprive him of equal protection. What is missing from his pleadings is something that plausibly pegs this claim to facts. Without even a whiff of facts other than the gender difference between Liang and Tan, all that is offered are naked assertions of discrimination. (*See* Am. Compl. ¶¶ 134-35, 137). They cannot survive a 12(b)(6) motion. *See, e.g., 33 Seminary LLC*, 869 F. Supp. 2d. at 309-10 (plaintiffs

25

failed to satisfy second prong of selective enforcement claim because their claims were based on "mere[ly] conclusory allegations"); *John Gil Const., Inc. v. Riverso*, 99 F. Supp. 2d. 345, 353 (S.D.N.Y. 2000) ("[P]laintiff's assertions of selective enforcement and racial animus are wholly conclusory and unaccompanied by any supporting factual allegations."); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir. 1987) ("[I]t is well settled that . . . allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983."). Nor do they support Liang's claim here, which is dismissed with prejudice.

### d. *Civil RICO Claims*

Next for consideration are Liang's claims that he was injured by violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* To maintain a civil action under RICO, a plaintiff must show "(1) a violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the violation of RICO." *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001). To state a violation of the RICO statute, the plaintiff must allege "(1) conduct (2) of an enterprise[15] (3) through a pattern (4) of racketeering activity, which is defined to

---

[15] The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

include specified predicate acts."[16] *Zimmerman v. Poly Prep Country Day School*, 888

F. Supp. 2d. 317, 327 (E.D.N.Y. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473

U.S. 479 (1985)). A plaintiff may also advance a cause of action for conspiracy to

violate RICO, regardless of whether the predicate acts were successfully carried out.

*See* 18 U.S.C. § 1962(d). Courts have required that "each predicate act . . . be

articulated clearly in a civil RICO complaint. This articulation requirement is

particularly enforced when, as in the case at bar, a RICO civil conspiracy claim is

made." *Rafter v. Bank of America*, No. 04-Civ.-3341, 2009 WL 691929, at *14

(S.D.N.Y. Mar. 12, 2009).

Liang alleges that the City defendants violated RICO by harassing him and

taking false complaints against him. (Am. Compl. ¶¶ 156-157, 160). He further

claims that the City defendants conspired together and with the non-City

defendants to violate his constitutional rights, harass and falsely arrest him, seize his

business and property, and accept benefits from the non-City defendants in order to

harm him. (*Id.* ¶¶ 158-159, 161-164). His litany of injurious wrongs include

complaints that he suffered physical, emotional, mental, and financial harm as a

result of the conduct violating RICO. (*Id.* ¶ 165).

---

[16] These predicate acts must fall within one of the following categories: a broadly-
defined class of offenses encompassing most state–level felonies; an enumerated list
of federal felonies; certain offenses pertaining to union and labor activities; various
fraud offenses; acts indictable under the Currency and Foreign Transactions
Reporting Act; specified acts indictable under the Immigration and Nationality Act;
and any act that is indictable under any provision listed in 18 U.S.C. §
2332b(g)(5)(B). 18 U.S.C. § 1961(1). A "pattern of racketeering activity" means two
or more predicate acts separated by fewer than ten years. *Id.* § 1961(5).

At the pleading doorway, Liang's RICO claim against the City itself is dismissed because, as many previous courts in this Circuit have held, "a municipal corporation is incapable of having the criminal intent to support RICO's predicate offense requirement." *Brewer v. Vill. of Old Field*, 311 F. Supp. 2d. 390, 398 (E.D.N.Y. 2004) (internal quotations and alterations omitted); *see also, e.g., Rafter*, 2009 WL 691929, at *15; *Pilitz v. Inc. Vill. of Rockville Centre*, No. 07-CV-4078, 2008 WL 4326996, at *5 (E.D.N.Y. Sept. 22, 2008); *Interstate Flagging, Inc. v. Town of Darien*, 283 F. Supp. 2d. 641, 645-46 (D. Conn. 2003); *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 457 (S.D.N.Y.1998); *Wee v. Rome Hosp.*, No. 93-CV-498, 1996 WL 191970, at *5 (N.D.N.Y. Apr. 15, 1996); *O & K Trojan, Inc. v. Mun. & Contractors Equipment Corp.*, 751 F. Supp. 431, 434 (S.D.N.Y. 1990); *Nu–Life Construction Corp. v. Bd. of Educ.*, 779 F. Supp. 248, 251 (E.D.N.Y. 1991). Furthermore, because the City is immune to civil RICO liability, its individual officers and agents are similarly immune in their official capacities. *See, e.g., Frooks*, 997 F. Supp. at 457 ("[B]ecause the Town cannot be held liable under RICO as a matter of law, neither may the Town employees in their official capacities."); *Rini v. Zwirn*, 886 F. Supp. 270, 295 (E.D.N.Y. 1995 ("[S]ince the municipality cannot be held liable for the acts of its agents, the Town employees, in their official capacity, cannot be held liable under RICO."). All civil RICO claims against the individual City defendants in their official capacities are dismissed. *See Wood v. Inc. Vill. of Patchogue of New York*, 311 F. Supp. 2d. 344, 354 (E.D.N.Y. 2004).

28

Plaintiff fares no better on his individual capacity claims against the City defendants. None of his allegations are more than "merely consistent" with these officers' liability, had such liability otherwise been plausibly pleaded. *Iqbal*, 556 U.S. at 678. Bluntly, he fails to state facts that plausibly allege racketeering activity. Under § 1961(1), "racketeering activity" encompasses an extensive catalogue of prohibited activities that range from murder to mail fraud. 18 U.S.C. § 1961(1); *see*, *supra*, p. 27 n.16. Liang's complaint cites none of the predicate offenses listed in § 1961(1). In their stead, he alleges in vague terms that the City defendants harassed and accepted false complaints against him, and that they conspired with the non-City defendants to do both of those things, as well as to violate his constitutional rights, falsely arrest him, and seize his business and property. (Am. Compl. ¶¶ 156-164). None of these acts are among the possible predicate offenses listed in § 1961(1).

Hinged to Liang's RICO claim, but an overtone throughout the entire complaint, is his theory of a grand conspiracy—that the City defendants conspired with non-City defendants to punish him and deprive him of his constitutional rights, and did so corruptly (as RICO predicates) in exchange for bribes, gratuities, and other benefits from Tan. (*Id.* ¶¶ 2, 26, 180, 232, 159). The only "benefits" that Liang points to are a demo phone line that Detective Zee allegedly activated, which provides free cell phone calls, and a wireless account that Detective Hawkins opened with EW Studio, one of the companies Tan and Liang had operated together. (*Id.* ¶¶ 55-56).

Deemed true for the purposes of the motion, the fact train stops there. Standing alone, these acts do not qualify as predicate RICO offenses, nor even crimes. The void left by the absence of pleaded facts connecting any of the charged conduct to a conspiracy is even more gaping. No facts supporting the existence a criminal scheme of any kind are pleaded. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (RICO conspiracy must involve a pattern of "related" offenses that "amount to or pose a threat of continued criminal activity"). Indeed, Liang does not even allege that Tan was responsible for providing Zee with access to the demo line, or that Hawkins did not pay for the wireless account with EW Studio. Liang's assertions, plainly, do not "allow[ ] the court to draw the reasonable inference that the defendant[s]" are liable for violating RICO by taking bribes in a conspiracy whose focal point is plaintiff's cell phone business. *Iqbal*, 556 U.S. at 678.

What remains of the wrongdoing charges offered to advance the RICO claim are, at the end, Liang's allegations that Detective Zee and/or un unidentified associate threatened Liang's attorney not to proceed with a real estate transaction; that Defendant Scali convinced two individuals—Xiao Yun Li and an otherwise unidentified "retired police officer Phil"—to falsely accuse him of plotting to murder Detective Zee; that Liang had seen Detective Zee leaving the 41-40 Kissena Boulevard store in September 2008; and that in response to two complaints he had filed, the NYPD Investigations Unit informed Liang there was sufficient evidence to prove unspecific misconduct charges against Detective Zee. (Am. Compl. ¶¶ 52, 96-97, 106-107, 119-120).

30

RICO requires more than a scattergun blast. Accepting as true, as the Court must, the litany of peccadilloes pleaded by Liang (even those allegations that are not criminal in nature), Liang pleads no facts showing a pattern of racketeering activity within the meaning of RICO. Of the acts so alleged, only "threatening" (a conclusory allegation) an attorney not to proceed with a legal transaction might conceivably fall within one of the predicate offenses described in § 1961(1). Yet, at the amended complaint stage, the nature of the putative "threat" is entirely undescribed. In any case, a single predicate offense will not suffice. Rather, a plaintiff must show a pattern of predicate offenses—at least two—such that the acts are "related, and that they amount to or pose a threat of *continued criminal activity*." *H.J. Inc.*, 492 U.S. at 239 (emphasis added). Liang pleads no facts to suggest that the City defendant have constructed a network of related and ongoing racketeering activities. For this reason in isolation, his RICO claim fails against those defendants involved in this list of alleged misdeeds.

Furthermore, Liang does not show the existence of an "enterprise" within the meaning of RICO, which defines it as "group of persons associated together for a common purpose of engaging in a course of conduct" and united by "an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Although Liang levels most of his fire against officers or detectives from NYPD's 109th Precinct, the bullets are blank. He pleads no facts to support his conclusory assertions that the City defendants constitute, control, or participate in an

31

enterprise with a distinguishable existence or purpose. Nor, from what is in the record, may the Court infer the existence of an enterprise with the objective, as plaintiff effectively claims, to persecute him through a pattern of racketeering activity. Without such an enterprise, a RICO claim like Liang's must fail.

Finally, Liang accuses the City defendants of conspiring to violate RICO. The requirements for maintaining a cause of action under § 1962(d), which creates a private right of action to bring RICO conspiracies to justice, "are less demanding" than those for standard-issue RICO claims. To be liable, a "'conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" *Baisch v. Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). "In the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme." *Baisch*, 346 F.3d at 377 (internal quotations omitted).

Liang's RICO conspiracy claim is no more meritorious than his standard RICO claim, and for the simple (and identical) reason that he has pleaded no facts suggesting either the kind of "scheme" described in *Baisch* or any enterprise intent on executing such a scheme. To state a claim for a RICO conspiracy, "mere allegations of agreement to commit predicate acts are insufficient." *Browning Ave. Realty Corp. v. Rosenshein*, 774 F. Supp. 129, 145 (S.D.N.Y. 1991) (describing the holding in *Morin v. Trupin*, 711 F. Supp. 97, 111-12 (S.D.N.Y. 1989)). At the core, a plaintiff must plead facts from which a court may infer that a "meeting of the

minds" occurred between the defendants. *Rosenshein*, 774 F. Supp. at 145. Liang fundamentally fails to meet that standard, pleading no facts to support the conclusion that there was a meeting of the minds, or to permit even an inference supporting it. As a result, all of Liang's RICO claims, including his claims alleging a conspiracy to violate RICO, are dismissed as to the City defendants.

### e. *Claims Under 42 U.S.C. § 1985(3)*

Civil rights law § 1985(3) allows plaintiffs to sue state officials who have conspired to violate their constitutional rights. *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010). A plaintiff advancing such a claim must plead facts that show: 1) a conspiracy; 2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen. *See Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). A conspiracy is "an agreement between two or more individuals where one acts in further[ance] of the objective of the conspiracy and each member has knowledge of the nature and scope of the agreement." *Morpurgo*, 697 F. Supp. 2d at 339. To sustain a § 1985 claim, a "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Further, for a § 1985(3) claim to survive dismissal, the conspiracy must also be "motivated by some racial or perhaps otherwise class-based, invidious

discriminatory animus behind the conspirators' action." *Thomas*, 165 F.3d at 146 (internal quotations omitted).

Liang's § 1985(3) claim fails as a matter of law because, as discussed previously, he has pleaded no facts suggesting a "meeting of the minds" among the City defendants, or any subset of them, or by any one of them with any other person, to violate his civil rights. Although his complaint states, for instance, that "defendants acted together to deprive Plaintiff of equal protection and of forth (sic) amendment protection from unlawful search and seizure," and that they "conspired . . . to victimize the plaintiff and take his business away from him," (Am. Compl. ¶¶ 16-21, 206), these are textbook examples of the kinds of conclusory allegations that are devoid of factual content. The crumbling point is Liang's failure to plead facts to support a conspiratorial meeting of the minds. From plaintiff's vantage point, the claim is nevertheless tantalizing. Given the nature of police work, seizure of person and property (clearly a harm) is often the result of officers working together as a team to execute a common plan. What is missing from the pleadings are any facts plausibly showing that any of the City defendants' conduct was prompted by a meeting of the minds to a commit a constitutional violation. *See, e.g., Webb*, 340 F.3d at 110 (rejecting a § 1985(3) claim because "plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] complaint containing only conclusory, vague, or general

allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.") (internal quotations omitted).

Furthermore, plaintiff's § 1985(3) claim presents no facts supporting the charge that the conspiratorial harm flowed from "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas*, 165 F.3d at 146 (internal quotations omitted). Liang asserts that the City defendants discriminated against him based on his gender and "arbitrarily chose[] to support the female complainant." (Am. Compl. ¶¶ 134, 137). Assuming that any non-race based claims qualify, and assuming further that if gender claims *do* qualify, that males fall within a protective umbrella, all there is to support such a claim is Liang's bald assertions that gender drove the conspiracy. That is, as is his entire claim, wholly without support. The § 1985(3) claims is dismissed.

### f.  Monell *Claims*

Liang also brings a claim for *Monell* liability against the City of New York under § 1983. A § 1983 cause of action against a municipality cannot be premised on *respondeat superior. See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). Instead, a plaintiff suing a city under § 1983 must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 87 (2d Cir. 2002) (under *Monell*, "a

35

municipality could be held liable for constitutional torts committed pursuant to a municipal custom or policy"). *See also Roe*, 542 F.3d at 36 ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

Under *Monell*, an actionable municipal policy or custom exists in the following circumstances:

> (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees.

*Bliven v. Hunt*, 478 F. Supp. 2d 332, 336-37 (E.D.N.Y. 2007) (citing *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y.1996)). If a plaintiff seeks to show a city policy by referring to only a single act, that act must have been committed by a city official "responsible for establishing final policy with respect to the subject matter in question," and must represent a deliberate and considered choice among competing alternatives. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986). If the plaintiff is challenging what he claims is an unofficial custom or practice of the city, he must show that the practice was "so widespread as to have the force of law." *Id.* (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 404). The custom "need not [have]

36

receive[d] formal approval by the appropriate decision-maker . . . [but] plaintiff must prove . . . that [it] is permanent." *Davis v. City of New York*, 228 F. Supp. 2d. 327, 337 (S.D.N.Y. 2002) (internal citations omitted).

Plaintiff cannot establish a claim for *Monell* liability. He charges generally that the City "maintains an unconstitutional policy, practice, and custom of toleration and approval of their detectives receiving bribes from one party to harass and assault another party," as well as "policies or customs exhibiting deliberate indifference to the constitutional rights of victims of hate crimes in the jurisdiction of the 109th precinct." (Am. Compl. ¶¶ 232-32). However, using the same whole cloth throughout, the complaint is entirely devoid of facts to buttress these assertions. Liang makes no claim, much less pleads facts showing, that the City has enacted any sort of official policy pursuant to which his rights were violated, and his allegations regarding an unofficial practice or custom are limited to the actions of specific detectives in a single police unit and factually supported only by a pleader's perceptions of his own experience.

Though accepted as true on the motion, these factual allegations show nothing like the kind of "widespread" and "permanent" unconstitutional practices or customs that *Monell* implicates. Nor does Liang include any facts showing that a single city official with final decisionmaking authority had any awareness of the supposed "policies or customs" he describes, let alone enacted, formulated, or ratified those policies. Indeed, he actually pleads facts to the contrary—that NYPD's

37

Investigations Unit was investigating Liang's claims against Detective Zee actions because they were *out* of policy. (*See* Am. Compl. ¶ 120).

Furthermore, Liang fails to plead facts indicating that the City's alleged failure to properly train or supervise its police officers was so egregious as to amount to "deliberate indifference" to the rights of individuals such as plaintiff. Although he contends that defendants Conforti, Michetti, and Natoli negligently supervised the officers under their command by failing to prevent the actions of which he complains, that charge is but another factually unsupported conclusion. It provides no prop for *Monell* liability.

Finally, as a related matter, Liang brings charges personally against Police Commissioner Kelly and Deputy Inspector Maguire of the 109th Precinct in their official capacities only. An official-capacity suit is in essence another avenue to sue the government entity to which the agent belongs. *See, e.g., Hafer v. Melo*, 502 U.S. 21, 26, 112 S. Ct. 358 (1991) ("An official-capacity suit against a state officer is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself.") (internal quotations omitted); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 297 (S.D.N.Y. 2009) ("A suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself.") (internal quotations omitted). Consequently, Liang's claims against Commissioner Kelly and Deputy Inspector Maguire, being equivalent to his *Monell* claim against the City, are dismissed along with the claims against the City, and for the same reasons.

38

g. *The Sole Remaining Federal Claim for Unreasonable Search and Seizure*

The Court having dismissed Liang's federal claims for false arrest, denial of equal protection, RICO violations, and conspiracy to violate civil rights, his sole remaining federal cause of action is a § 1983 claim for unreasonable search and seizure under the Fourth Amendment. Because the City defendants have explicitly declined to include this claim in their motion to dismiss, and since the parties have not briefed the issue, the Court does not address it. The Court does, though, observe that Liang may only sue those officers who are alleged to have been personally involved in the searches and/or seizures in question. *See, e.g., Farrel v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in [the Second] Circuit that *personal involvement* of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (emphasis added) (internal quotations omitted); *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) (a plaintiff in a § 1983 suit must allege "a tangible connection between the acts of the defendant and the injuries suffered"). Therefore, though not deciding the viability of the claim *in toto*, the Court notes these limiting parameters of case law. At no point does Liang plead facts connecting defendants Kelly, Maguire, Scali, or Natoli to the relevant searches or seizures in any personal manner. Accordingly, to the extent plaintiff's unreasonable search and seizure claim intended to encompass these individual defendants, those claims are dismissed by force of the Court's other determinations.

### h.  *State Law Claims*

Liang also interposes a slew of state law claims against the City defendants that are largely duplicative of his federal claims. The Court shall address them in turn.[17] First, he asserts a cause of action for unlawful detention and confinement, which is fundamentally identical to his federal false arrest claim. (Am. Compl. ¶¶ 151-154). For the reasons discussed in section II.b, *supra*, the claim is dismissed. Likewise, his cause of action for filing false complaints is effectively another iteration of false arrest, (*id.* ¶¶ 167-178), and is dismissed as well.[18]

Next, Liang asserts a cause of action for tortious interference with contract. (*Id.* ¶¶ 184-192). To succeed on such a claim, Liang would have to plead "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's

---

[17] With regard to any state law claims, the Court may only exercise jurisdiction over them if they are "so related" to his remaining federal claim for unreasonable search and seizure "that they form part of the same case or controversy." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir. 2011) (quoting 28 U.S.C. § 1367(a)). That is, the claims "must stem from the same common nucleus of operative fact," and "must be such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Montefiore Med. Ctr.*, 642 F.3d at 332 (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

[18] In the fact section of his complaint, Liang alleges that defendant Scali convinced two individuals-- Xiao Yun Li and an unidentified "Officer Phil"— to accuse Laing of "want[ing]" and "attempting" to murder defendant Zee. It is not clear whether he intended to include these allegations as part of his claim against the City defendants for filing false complaints. If he did, they are dismissed along with that claim. Even assuming these allegations are true, Liang makes no claim that any claims or charges were brought against him for attempt or conspiracy to commit murder, nor that he was ever arrested on those grounds. These accusations also concern entirely different events from those on which he bases his Fourth Amendment claim. Hence, they are not part of the same "common nucleus of operative fact," *Montefiore Med. Ctr.*, 642 F.3d at 332, and the court lacks jurisdiction over those claims in any event.

knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages." *Foster v Churchill*, 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156 (1996). Liang alleges that he had "valid contracts with Open Lifetime Group and a store at 41-40 Kissena Blvd.," that the City defendants "knew of the contract as evidenced by his [sic] relationship with Plaintiff's ex-girlfriend, Defendant Tan," and that they "intentionally interfered with the contract by engaging in false arrests of Plaintiff." (Am. Compl. ¶¶ 184-86). Putting aside the question of whether Liang has otherwise pleaded a plausible tortious interference claim, he does specifically plead that his false arrests were the wrongful acts of interference. Since the Court has already found that Liang has not plausibly pleaded viable false arrest claims, his tortious interference claim, with its pleaded link to these allegations, lacks an essential element, and it, too, is dismissed as a matter of law.

Incidentally, as putatively additional component of his tortious interference claim, Liang alleges that "Defendant Zee intentionally interfered with the contract by accepting the demo phone." (Am. Compl. ¶ 191). First, he does not specify what contract he is referring to, nor does he plead facts indicating breach. Furthermore, aside from being a naked accusation of a *quid pro quo* (and therefore insufficiently pleaded), it is clear that even this naked claim suggests nothing more than a motive for Detective Zee's "false" arrest of Liang. Neither the interactions between Zee and Tan, nor any other factual allegations in the complaint, plausibly support a claim that Zee or any other defendant tortuously interfered in Liang's contractual relationships.

Liang's next claim is for negligent supervision against the City defendants. As discussed in Section II.f, *supra*, he pleads no material facts to support his conclusory allegations that the supervisory officials exercised improper oversight over subordinate officers. As a consequence, this claim fails as a matter of law.

Lastly, plaintiff advances catchall claims against the City defendants under the New York State Constitution for violating the same kinds of rights protected under the United States Constitution, and for violating the state's police power. (*Id.* ¶¶ 180-82, 194-98). The parallel pleading on identical facts yields a congruent result. More importantly, "a private right of action for a violation of the [New York] Constitution is unavailable where an alternative remedy . . . exists." *Waxter v. State*, 33 A.D.3d 1180, 1181, 826 N.Y.S.2d 753, 754 (3d Dep't 2006) (citing *Lyles v. State of New York*, 2 A.D.3d 694, 770 N.Y.S.2d 81 (2d Dep't 2003)). As is, by now, obvious, Liang has had a whole host of alternative remedies available to him to vindicate every claim of harm. (Indeed, a federal search and seizure claim remains open.) Plaintiff has made no showing that he lacks an alternative remedy, justifying a private right of action under New York's state constitution. He has convincingly established just the opposite. That his pursuit of alternative relief fails for lack of merit *does not* mean the alternate avenues to relief did not exist.

As for Liang's claim that the City defendants "violat[ed] the state's police power," after the pleadings, it is hard to divine what that last straw is. It seems to amount to nothing more than a vague recapitulation of all his claims that the City and its police officers cloaked with and wielding the power of state law acted

unlawfully and caused him injury. It duplicates his federal civil rights claims, but, if having any legitimacy under state law at all, it must be viewed as a private action claiming violations directly under the New York State constitution. The availability of alternative remedies defeats it.

### Conclusion

For the reasons set forth above, the motion of New York City and its defendant employees is granted. All claims against them are dismissed, except for Liang's § 1983 claim for unreasonable search and seizure under the Fourth Amendment. That claim survives, but only as to defendants Zee, Hawkins, Shim, Vaughn, Conforti, and Michetti.[19]

So Ordered.


s/Eric N. Vitaliano

——————————————————
ERIC N. VITALIANO
United States District Judge

Dated: Brooklyn, New York
 September 18, 2013

---

[19] Because plaintiff has neither identified nor served John and Jane Doe defendants despite ample time to amend his complaint, and because he has not alleged facts in the complaint supporting Fourth Amendment claims against them, all causes of action against John and Jane Doe defendants are dismissed. *See* Fed. R. Civ. P. 4(m); *Hayward v. City of New York*, No. 12–CV–3220, 2012 WL 3580286, at *2 (E.D.N.Y. Aug. 17, 2012); *Cantave v. New York City Police Officers*, No. 09–CV–2226, 2011 WL 1239895, at *8 n.4 (E.D.N.Y. Mar. 28, 2011).